**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNYLVANIA**

| | | |
|---|---|---|
| PAUL V. AMBROSE,<br>an individual who is a<br>citizen of the Commonwealth<br>of Pennsylvania | : | COMPLAINT IN COPYRIGHT<br> INFRINGEMENT |
| | : | |
| | : | |
| Plaintiff, | : | CASE NUMBER: No. 07- |
| | : | |
|   vs. | | |
| | : | Judge Arthur J. Schwab |
| TRAIN COLLECTORS ASSOCIATION,<br>a Pennsylvania Non-Profit<br>(Non Stock) Corporation, | : | |
| | : | |
| and | : | |
| EASTERN DIVISION – T.C.A.<br>a Pennsylvania Non-Profit<br>(Non Stock) Corporation, | : | |
| | : | |
| Defendants. | | |

<u>**COMPLAINT IN COPYRIGHT INFRINGEMENT**</u>

AND NOW comes Plaintiff PAUL V. AMBROSE ("Ambrose"), an individual, by and through his undersigned attorney, and files the following Complaint against Defendants TRAIN COLLECTORS ASSOCIATION ("TCA") and EASTERN DIVISION – T.C.A. ("Eastern Division"), and respectfully avers the following:

<u>**Jurisdiction and Venue:**</u>

1. The jurisdiction of this Court is based upon 28 U.S.C. § 1400(a) in that Plaintiff is the current legal or controlling owner of valid copyrights that have been infringed upon by the averred unlawful acts of Defendants herein.

2. Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) in that substantial acts of copyright infringement giving rise to Plaintiff's claims occurred in the Western

Case 2:05-mc-02025-A Document 3473

District of Pennsylvania and in the Commonwealth of Pennsylvania and Defendants TCA and the Eastern Division have been selling, promoting and/or publicizing the averred Infringing Work in the Pittsburgh area.

3. Venue is also proper in the Western District of Pennsylvania pursuant to 28 U.S.C. §1391(c) in that the Defendants have substantial business contacts with the Western District of Pennsylvania in that the TCA was originally incorporated in Allegheny County; its current President resides in Allegheny County; and upon information and belief, significant meetings and discussions relating to the averred Infringing Work took place, in part, within Allegheny County, or with at least one party who at the time of such meetings and/or discussions was physically within Allegheny County. Further, Defendant Eastern Division regularly solicits and receives tens of thousands of dollars on an annual basis from members in Allegheny County by direct mailings to said District and has also mailed materials to thousands of members in the Western District that are relevant to the Infringing Work.

**The Parties:**

4. Plaintiff Paul V. Ambrose is an adult citizen of the Commonwealth of Pennsylvania, residing in Canonsburg, PA 15317 in the County of Washington, Pennsylvania. Ambrose also maintains an office in the Municipality of Bethel Park, County of Allegheny, Pennsylvania.

5. Defendant TCA is a Pennsylvania Non-Profit (non-stock) Corporation originally incorporated in Allegheny County, Pennsylvania on or about March 15, 1957 and that currently maintains a business address at 300 Paradise Lane, Post Office Box 248, Strasburg, PA 17579 in the County of Lancaster. The

Case 2:05-mc-02025-A   Document 3473   Filed 09/17/2007   Page 3 of 46

Mission Statement of the TCA is "[t]o develop an appreciation of and to preserve an important segment of history – Tinplate Toy Trains – through research, education, community outreach, fellowship, establishment of collecting standards, and to promote the growth and enjoyment of collecting and operating toy, model and scale trains."

6. Defendant Eastern Division is a Pennsylvania Non-Profit (non-stock) Corporation originally incorporated on or about November 30, 1992 and that currently maintains a registered business address at One West Broad Street Suite #700, Bethlehem PA 18018 in the County of Northampton. Defendant Eastern Division is one of approximately twenty current divisions of the TCA, where members of the fifty states are divided into various regional divisions so that a TCA member can be both a member of the TCA as well as of one Division. The Eastern Division is principally known as the entity that holds, and greatly profits from, the three-Day Toy Train Show held at the York Fairgrounds in York, Pennsylvania two times a year (in April and October of each year) that it correctly calls "the World's Greatest Train Show." The York Train Shows, as advertised by Defendant Eastern Division, avers to regularly attract more than 10,000 TCA Members and family members of TCA Members to each show.

**The Infringing Work:**

7. Krause Publications, Inc. ("Krause) in April, 2007 published the "Standard Catalog of Lionel Train Sets 1945-1969", authored by David Doyle, ISBN: 978-0-89689-444-0, Library of Congress Number: 2006925056 ("Infringing Work"). The Infringing Work carried a copyright on behalf of David Doyle ("Doyle") although at the time of the filing of this Complaint no evidence of such registration can be found in an Internet search of the records of the United States Copyright Office.

3

8. On April 24, 2007, Plaintiff purchased for a total of $32.09 (including tax) a copy of the Infringing Work at the Iron Horse Hobby Shop, 1950 Painters Run Road, Pittsburgh, PA 15241-3014 in the County of Allegheny, Pennsylvania.

9. Plaintiff was unaware of the publication of the Infringing Work until he attended the Spring 2007 York Train Meet sponsored by Defendant Eastern Division, where it was being promoted by book signings that were held within at least one of the Member Halls and which were permitted to be held by Defendant Eastern Division. The Infringing Work was also promoted by a book signing held by Defendant TCA at its Toy Train Museum located at the TCA Headquarters in Strasburg, Pennsylvania during the York Show week. Upon information and belief, the Infringing Work was also promoted in the "Spring 2007 York Registration Packet" that was mailed out to tens of thousands of TCA members by Defendant Eastern Division as well as in the TCA Newsletter mailed to its members before the April 2007 York Meet.

**The Copyrighted Works:**

10. Plaintiff since 1990 has been the preeminent author of books pertaining to the manufacturing of Toy Trains by the Lionel Corporation for the period normally defined by knowledgeable collectors as the Post-War Years (1945 through 1969). Ambrose has, in part, authored, co-authored or edited:

> (i) Greenberg's Guide to Lionel Trains: 1945-1969: vol. 4 Uncatalogued Sets (along with Joseph P. Algozzini)(TX-3-427-685), published 1992, registered 1992;

> (ii) Greenberg's Guide to Lionel Trains, 1945-1969: vol. 5, Rare and Unusual (along with Harold J. Lovelock) (TX-3-658-641), published 1993, registered 1993;

> (iii) Greenberg's Guide to Lionel Trains, 1945-1969: vol. 7, Selected Variations (along with

4

Harold J. Lovelock) (TX-4-151-184), published 1995, registered 1995;

(iv) Greenberg's Guide to Lionel Trains, 1945-1969: vol. 7, Selected Variations (along with Harold J. Lovelock) (TX-4-473-997), published 1995, registered 1995;

(v) Greenberg's Guide to Lionel Trains, 1945-1969: vol. 1, Motive Power & Rolling Stock (with the assistance of Harold J. Lovelock) (TX-5-305-053), 10th edition, published 2000, registered 2000; and

(vi) Greenberg's Guide to Lionel Trains, 1945-1969: vol. I, Motive Power and Rolling Stock including Accessories, authored by Bruce C. Greenberg; edited by Paul V. Ambrose with the assistance of Alan Stewart and Joe Algozzini (TX-3-053-968), Eighth Edition, published 1991, registered 1991.

11. In each copyrighted work identified in Paragraph 10 herein, Ambrose was the principal or sole author of the written text and was the principal researcher. Ambrose has also been the author or co-author of a multitude of featured Articles contained in *Classic Toy Trains*, a deluxe magazine published by Kalmbach Publishing Company for the Toy Train Collector.

12. Plaintiff is the current legal owner of by right, title, interest, registration, assignment and/or by contract, and/or is the current assignee of any litigation rights arising from, the copyrights of the following additional works ("Copyrighted Works") on which he was the sole author and which this Complaint avers Defendants have contributory and/or vicariously infringed by the sale of, contribution to, promotion of, and/or distribution of the Infringing Work:

(i) Greenberg's Guide to Lionel Trains 1945-1969, Volume III: Catalogued Sets, Second Edition, ISBN: 0-89778-449-9, the copyright of which was registered on November 27, 1998 by Kalmbach Publishing Company of Waukesha, Wisconsin on behalf of the Plaintiff, and which was first

5

published on November 16, 1998 (TX-4-899-091) ("Edition 2");

(ii) Greenberg's Guide to Lionel Trains 1945-1969, Volume III: Catalogued Sets, ISBN: 0-89778-172-4 and 0-89778-173-2, the copyright of which was registered on March 7, 1991 by Greenberg Publishing Company, Inc. of Sykesville, Maryland on behalf of the Plaintiff, and which was first published on December 3, 1990 (TX-3-038-713) ("Edition 1"); and

(iii) Greenberg's Pocket Price Guide and Inventory Checklist to Lionel Catalogued Sets, 1945-1969), ISBN: 0-89778-209-7, the copyright of which was registered on January 2, 1992 by Greenberg Publishing Company, Inc. of Sykesville, Maryland on behalf of the Plaintiff, and which was first published on October 17, 1991 (TX-3-248-947) ("Pocket Guide").

13. True and Correct Copies of the Certificates of Registrations for the Copyrighted Works by the Register of Copyright, as obtained from the website of the United States Copyright Office, are attached hereto as Exhibit A. True and Correct Copies of Additional Certificates of Registration by the Register of Copyright for the Copyrighted Works are attached hereto as Exhibits B, C and D.

14. The Copyrighted Works contain materials wholly original that were solely authored by Plaintiff that are copyrightable subject matter under the laws of the United States. The Copyrighted Works incorporated "creative sparks." Plaintiff, by and through his publishers, Greenberg Publishing Company, Inc., and/or Kalmbach Publishing Company, in its own name and/or as the successor in interest to Greenberg Publishing Company, Inc., have produced, published and distributed the Copyrighted Works in conformity with the provisions of the Copyright Act and other laws governing copyright. Thousands of copies of the Copyrighted Works have been sold to thousands of Train Collectors over the years and

6

Plaintiff has received royalty checks from his Publishers for each of the Copyrighted Works.

15. Before Plaintiff began authoring books on the Lionel Post-War Period, various earlier Toy Train books published, including prior groundbreaking Greenberg's Guides, were nothing more than mere recitals of items found in the various Lionel Consumer Catalogs that Lionel distributed during that period as well as unconfirmed information furnished the publishers by an assortment of collectors with various degrees of expertise. However, Lionel, as were most manufacturers during the Post-War period, was more interested in being a profitable business, rather than strictly conforming to their Catalogs. Accordingly, many items that Lionel listed in the Consumer Catalogs, including Sets (i.e. assemblage of items that were headed by a least one motive unit and which included several cars, usually priced as a Set substantially less than the total of the individual prices listed in the Catalogs) were either never made by Lionel, if Lionel could not obtain sufficient pre-sales, or substantially differed from what was drawn, pictured or listed in the Catalogs.

16. Lionel during the production of an item over the course of a year, or several years, during the Post-War period may have changed the colors, lettering and/or method of manufacturing a particular model, resulting in various variations of that particular model. Some of these various variations have become quite valuable and sought after by Advance Collectors. Ambrose, who has one of the finest Lionel Post-War Collections in the world, and his various Collector friends, who became co-authors of various books with Ambrose as identified in Paragraph 10 herein, or subsequently authored books on their own behalf, spent decades and hundreds of thousands of dollars in an attempt to purchase all outstanding variations and Sets (both Catalogued and

Uncatalogued) in the Lionel Post-War period, in part, so that they could use these examples as the basis for a series of books on Lionel Post-War Trains.

17. Beginning with Ambrose's editing the Book identified in Paragraph 10(vi) herein, Ambrose brought an academic and scientific approach to the cataloging of Lionel Production in the Post-War years. Ambrose removed from the previous Greenberg's Guides items and variations listed as Lionel Post-War Production that were in his opinion actually never produced by Lionel, including some variations that were actually produced by unscrupulous Collectors who intended to defraud Collectors of thousands of dollars. Ambrose also produced a structured approach for the identification of various production variations made by Lionel, including a naming system for identifying the various types of Original Boxes that Lionel produced to box its product during the Post-War period. Because most original purchasers of Lionel Trains disposed of the fragile Original Boxes, Original Boxes have become very valuable to the Advance Collector and some boxes (without the trains that originally came inside them) have sold for thousands and tens of thousands of dollars.

18. Ambrose, as an Advance Collector of Lionel Post-War Catalogued Sets since the 1960s, spent several decades making various notes and observations as to his opinions of Lionel's actual production of Catalogued Sets. Beginning in Edition 1 of the Copyrighted Works, which was first published in 1990, and in Edition 2 of the Copyrighted Work, which was first published in 1999, Ambrose drew on his thousands of hours of observations as to actual production of Lionel Post-War Catalogued Sets, as well examinations of hundreds, if not thousands, of Post-War Sets owned by Ambrose, at a substantial cost to him, and his collector friends, to write material wholly original and creative as to his

8

opinions of the actual production of Lionel Post-War Catalogued Sets.

19. Ambrose in Edition 1 and Edition 2 of the Copyrighted Works also set forth the material facts and opinions of Lionel's actual production in the Post-War Period with original, creative and copyrightable organization by dividing the production into Chapters where each Chapter was a particular year, the Chapter started with text as to Lionel's new production for that particular year, as well as changes in production methods and variations introduced in that particular year. The Editions then lead to a listing of Catalogued Sets, organized by Catalog Number where the lowest number came first (a format not consistently used by Lionel in its Catalogs), including selection of certain Sets chosen by Ambrose that were not shown in the Lionel Consumer Catalogs, followed by the next used sequential number. The listing for each so identified Cataloged Set included first the makeup of that particular Catalogued Set (i.e. a complete listings as to what engines, cars, track, transformers and other items) that came with that Set, and then a Discussion/Examination portion of the text discussing the makeup of that particular Set, various variations that might have come in that Set, and identification of the Box types and Manufacturer types of the items that were included in that particular Set. Prior to Ambrose's Copyrighted Works, no author had taken this creative approach to any Catalogued Set Book written on Toy Trains made by Lionel or any other manufacturer. Finally, Ambrose also included a value of the Catalogued Set in various Conditions.

20. Upon advise from his Original Publisher, Bruce Greenberg, Ambrose included creative minor and deliberate typos ("ringers") in his various works, including the three Copyrighted Works, in order to protect his Intellectual Property that arose from the

9

thousands of hours, and hundreds of thousands of dollars, that Ambrose had devoted to these Copyrighted Works and to further protect the copyrights that had been taken out on the Copyrighted Works. These "ringers" were original to Ambrose and did not exist prior to the time of their creation by Ambrose in the opinion of any other collectors or anyone else. However, Advance Collectors who reviewed Ambrose's Copyrighted Work would have easily recognized the "ringers" and the reasons why Ambrose included them in his works.

21. In the Spring of 2004, Ambrose became one of the two General Partners of AmbroseBauer Trains ("ABT"), a business devoted to the facilitation of the auctioning of Toy Trains and specializing in the auctioning of Lionel Post-War items. ABT began to advertise its expertise on Toy Trains based on the fact that of the Five Principal Auction Houses devoted to Toy Trains, ABT was the only firm that had a partner involved in authoring a series of Published Books on Toy Trains. The advertised slogan of ABT was "We Wrote the Book on Toy Trains" and Ambrose and ABT spent thousands of dollars in advertising and direct mailings in order to establish the slogan and the ABT business. Ambrose's investment in ABT is currently greater than $100,000.00 (derived from a mortgage on his residence) and ABT is currently on pace to facilitate the auction of between $1,000,000.00 and $2,000,000.00 of Toy Trains per year.

22. As a result of Ambrose's published Works, the Lionel Corporation subsequently requested Ambrose as the sole Collector to examine its Post-War Archives and to inventory and organize them. Ambrose was also able to examine the actual production records of Lionel that were currently held by Lionel, or other Collectors that were friendly to Ambrose and/or named by Ambrose as co-authors, and was able to draw upon such unpublished

10

information for the creative text that Ambrose included in his Copyrighted Works. Ambrose's former co-author, Joseph P. Algozzini, also had an opportunity to examine Lionel's Post-War Archives as well as to examine its Post-War production records.

**The Infringing Activities (The Book):**

23. The Infringing Work was actually copied and transcribed by Doyle from Edition 2 to serve as the basis of the Infringing Work, where Doyle, once Edition 2 was actually copied and transcribed by him or for his benefit, added or deleted minor amounts of material and moved around portions of sentences in an attempt to be able to claim the Infringing Work as his own work in that:

> (i) the Infringing Work substantially copied complete, or virtually complete, sentences and paragraphs from dozens of Sets included in Edition 2, some of which had earlier been included in Edition 1 or the Pocket Guide. In brief example:

> **(a) Set #11385: 1963 Space Set:**

> From Edition 2 of the Copyrighted Works, Page 161:

> The premiere 027 space-age set, its outfit carton was most often a tan conventional two-tier type, but a solid orange variation numbered "11385-500" exists. The -500 version of the set box usually contained a 212P/212T Santa Fe pair. The rolling stock, except for the 3349 and 3830, came with one fixed and one operating coupler. The 3349 and the 3830, because they were carry-forward inventory, were the only items that were component boxed.

> From the Infringing Work, Page 236:

> The premiere 027 space-age set, its outfit carton was most often a tan conventional two-tier type, but a solid orange variation numbered "11385-500" exists. The -500 version of the set box usually contained a 212P/212T Santa Fe pair. The rolling stock, except for the 3349 and 3830, came with one fixed and one

11

operating coupler. The 3349 and the 3830, because they were carry-forward inventory, were the only items that were component boxed.

**(b) Set #11201: 1962 Scout Set:**

From Edition 2 of the Copyrighted Works, Page 149:

The -75 suffix does not appear on the gondola; it was the means by which Lionel distinguished this car's load. The unnumbered flatcar, usually black, has only "LIONEL" on the sides and came with an orange girder.

From the Infringing Work, Page 223:

The -75 suffix does not appear on the gondola; it was the means by which Lionel distinguished this car's load. The unnumbered flatcar, usually black, has only "LIONEL" on the sides and came with an orange girder.

**(c ) Set #1605W: 1958 Passenger Set:**

From Edition 2 of the Copyrighted Works, Page 149:

The outfit box was the routine 027 basket-weave type. The P and T units each came in the newly sized Standard carton made by the Star Company. Interior packaging included two cardstock rings inserted as coupler protectors. The "208" number on the engines was changed from "204" in 1957 because of the addition of a horn to the P (powered) unit and the removal of the headlight from the T (trailer) unit. The rolling stock came with AAR trucks in both Late and Bold Classic boxes. The only new item was the 6802 that came with two black U.S. Steel girders, while the repeat 6801 surfaces with a blue or yellow boat.

From the Infringing Work, Page 167:

The outfit box was the routine 027 basket-weave type. The P and T units each came in the newly sized Standard carton made by the Star Company. Interior packaging included two cardstock rings inserted as coupler protectors. The "208" number on the engines was changed from "204" in 1957 because of the addition of a horn to the P

12

(powered) unit and the removal of the headlight from the T (trailer) unit. The rolling stock came with AAR trucks in both Late and Bold Traditional boxes. The only new item was the 6802 that came with two black U.S. Steel girders, while the repeat 6801 surfaces with a blue or yellow boat.

**(d) Set #1571: 1957 Diesel Freight:**

From Edition 2 of the Copyrighted Works, Page 99:

This outfit came packaged in two ways: in a single-tier basket-weave carton with all the contents unboxed and separated by cardboard dividers or in a conventional two-tier basket-weave box with the top and bottom levels separated by a unique die-cut cardboard divider.

From the Infringing Work, Page 146:

This outfit came packaged in two ways: in a single-tier basket-weave carton with all the contents unboxed and separated by cardboard dividers or in a conventional two-tier basket-weave box with the top and bottom levels separated by cardboard.

**(e) Introduction, 1956:**

From Edition 2 of the Copyrighted Works, Page 86:

The short gondola and single-dome tank car were renumbered to 6112 and 6025, respectfully and all 1956 examples were black.

. . .

Of critical importance in 1956 is that Lionel, for the first time in the postwar era, released some outfits that did not have any of the individual contents component-boxed. The first four 027 gauge outfits were packaged in this manner.

13

From the Infringing Work, Page 130:

The short gondola and single-dome tank car were renumbered to 6112 and 6025, respectfully and all 1956 examples were black.
Of critical importance in 1956 is that Lionel, for the first time in the postwar era, released some outfits that did not have any of the individual contents component-boxed. The first four 027 gauge outfits were packaged in this manner.

### (f) Set #2227W: 1954 Santa Fe Freight Set:

From Edition 2 of the Copyrighted Works, Pages 71-72:

A visually appealing set with myriad colors. The outfit box was a conventional 1953-54 issue. The powered unit was boxed in a Standard carton with a protective liner, while the T unit came with a liner in a Middle Classic box. The remainder of the rolling stock also came in Middle Classic boxes.

From the Infringing Work, Page 112:

This was a visually appealing set with myriad colors. The outfit box was a conventional 1953-54 issue. The powered unit was boxed in a Standard carton with a protective liner, while the T-unit came with a liner in a Middle Traditional box. The remainder of the rolling stock also came in Middle Traditional boxes.

### (g) Set #1537WS: 1955 Freight Set:

From Edition 2 of the Copyrighted Works, Page 47:

The set box was a conventional 1955 two-tier issue. The engine was packed in the new revised carton.

From the Infringing Work, Page 78:

The set box was a conventional 1955 two-tier issue. The engine was packed in the new Revised carton.

14

**(h) Set #1469WS: 1949 Freight Set:**

From Edition 2 of the Copyrighted Works, Page 47:

This set carton could have been either a 1949 type of the new issue for 1950.
From the Infringing Work, Page 64:

This set carton could have been either a 1949 type of the new issue for 1950.

**(i) Set #1430WS: 1948 Passenger Set:**

From Edition 2 of the Copyrighted Works, Page 37:

This was the introductory set for the newly designed green plastic streamlined passenger cars. It was headed by the 2025, which in 1947 had pulled tinplate cars. The 2025 shared the same boiler casting as the O gauge 675, and some outfits observed contained a 675 engine. The set box was regular issue for the period. All components, including the engine and tender, came with lines in new Early Classic boxes. This is one of the more desirable sets from the product year. Note that the green 2400-series passenger cars were also included in O Gauge set 2140WS.

From the Infringing Work, Page 42:

This was the introductory set for the newly designed green plastic streamlined passenger cars. It was headed by the 2025, which in 1947 had pulled tinplate cars. The 2025 shared the same boiler casting as the O gauge 675, and some outfits observed contained a 675 engine. The set box was regular issue for the period. All components, including the engine and tender, came with lines in new First Traditional boxes. This is one of the more desirable sets from the product year. Note that the green 2400-series passenger cars were also included in O Gauge set 2140WS.

(ii) the Infringing Work paraphrased substantially and material portions of sentences and paragraphs from over **300** Sets and multiple Introductions included in Edition 2, some of which had earlier been included in Edition 1 or the Pocket Guide. In brief example:

15

**(a) 1957 Introduction:**

From Edition 2 of the Copyrighted Works, Pages 97 and 98:

Another new and cost-savings item, the manually operated 1008 camtrol uncoupling unit, made a quiet debut in three 027 outfits. It allowed Lionel to discontinue the inclusion of the more costly 6029 electromagnetic uncoupling track with low-end sets. The 6029, which only uncoupled, became standard issue for all other 027 outfits, replacing the more expensive 6019, which both uncoupled and activated operating cars.

From the Infringing Work, Page 145:

The 1008 Camtrol uncoupler was a manually operated device that was included in the three least 027 outfits in lieu of the previously used 6019 electromagnetic uncoupling/unloading track. Throughout the rest of the 027, the 6019 was replaced by the uncouple-only 6029.

**(b) Set #2293W: 1957 GG-1 Freight:**

From Edition 2 of the Copyrighted Works, Page 105:

The set carton was the new rust-brown basket-weave type with exclusive Super O graphics. The GG1 tooling was modified in 1957 and now featured even-height ventilators. The usual engine for this outfit was the rubber-stamped, solid-stripe version with the new ventilator design; it came packaged in a Standard carton with a protective liner that was made by National with a "57" date below the box manufacturer's seal.

Two other collectible variations of the 2360 are known to sometimes appear with this set: one was a five-stripe with a large PRR keystone decal that was completed from leftover, partially decorated 1956 inventory; the other was a rubber-stamped, solid-stripe version with uneven (stepped) ventilators. The later is extremely scarce, as it was made to deplete the on-hand supply of already cast G1 bodies. This model is more difficult to acquire in collector

16

condition than any other of the 2360-series electrics, even the more notable five=-stripers.

From the Infringing Work, Page 157:

The 2360 was slightly redesigned for 1957 with the tops of the simulated ventilators all the same height; whereas previously the top had been staggered. The decoration process was revised for 1957 as well, with a single broad rubber-stamped stripe running the length of the locomotive and an oversized keystone centered on each side above the stamped lettering. The locomotive came in a tan corrugated box with a liner made by National. The date "57" was stamped on the box below the marker seal.

The Set carton was the new rust-brown basket-weave type with Super O-exclusive graphics.

**(c ) 1961 Introduction:**

From Edition 2 of the Copyrighted Works, Page 138:

The early version of the AAR truck with a metal knuckle was still the norm in 1961, as were operating couplers at both ends. No cars, other than passenger, would routinely see a metal truck again until 1969. Sometime toward the end of the product year, the metal knuckle on AAR trucks was replaced with a Delrin knuckle (without pivot points), but it was still attached to the coupler head by means of a silver knuckle pin.

From the Infringing Work, Page 208:

Metal trucks were eliminated from virtually all the rolling stock, including tenders and cabooses. Even the AAR-type trucks were subject to cost reduction because by the end of the year the metal knuckle previously used was replaced with a plastic knuckle, but still installed with a shiny rivet. . .

17

**(d) Set #1648: 1961 2037 Freight Set:**

From Edition 2 of the Copyrighted Works, Page 143:

This outfit came in the new solid orange conventional two-tier set carton with the contents individually boxed. All the components were repeat items. The 233W tender with AAR trucks replaced the discontinued 6026W. The Orange Perforated box for the Cities Service tank cart had a "-110" suffix on the end flaps. Because this was a transition year, this set usually came with a combination of the new Orange Picture and carryover Orange Perforated boxes.

A modification was made in 1961 to the whistle control mechanism inside some 1063 transformers to prevent the reversing unit of the engine from inadvertently engaging when the whistle was blown. Transformers that incorporated this change were manufactured with a green whistle control button instead of the common red one.

From the Infringing Work, Page 214:

With the singular exception of the tender, from one end to the other this entire outfit was comprised of repeat items. Because of this, the cars in this outfit were packed in a combination of Perforated and Orange Picture boxes. The proper box for the Cities Service tank car is stamped 6465-110.

This outfit came in the new solid orange conventional two-tier set carton with the contents individually boxed. An unusual feature of this outfit is the mundane color of the whistle button on the transformer. The green button was indicative of a modification to the whistle control mechanism that prevented it from tripping the reverse unit of the locomotive unintentionally. Conventional transformers had a red button.

18

**(e) Set #1649: 1961 Santa Fe Freight Set:**

From Edition 2 of the Copyrighted Works, Page 143:

This outfit came in the new two-tier solid orange set carton with individually boxed components. This was one of only two catalogued sets that offered the Santa Fe B Unit and the only one in which it was boxed. The 218C came in an Orange Picture box, while the Alco A unit came in a Revised carton. The Fort Know car was new for 1961 and is very collectible. The 6343 and 6405 were also new for 1961 and, along with the 6445, came in Orange Picture boxes.

A variation of this set was also packaged by Lionel; it was numbered "1649NE", and 226 Boston and Maine A-B units replaced the Santa Fe. Could the "NE" designation have stood for "New England," which was the home of the Boston and Maine?

From the Infringing Work, Page 214:

. . .

The 218C B-unit, with the box itself being very uncommon, also used an Orange Picture Box. The Alco A-unit was packaged in a tan corrugated carton. Some sets reportedly have the Santa Fe units replaced with 226 Boston and Maine A-B combinations. Two-tier orange set boxes were used for these outfits, with the B&M set cartons being stamped as 1649NE.

**(f) Set #12502: 1962 General Gift Pack:**

From Edition 2 of the Copyrighted Works, Page 154:

Since this was a gift pack, it came with neither track nor transformer. Lionel called this set the "PRAIRIE-RIDER". The typical 027 items came packaged in an orange-and-white Type A display-style outfit box. Sales of the General were slow; this last-edition set was catalogued only to deplete inventory. For a collector's point of view, this is the most desirable of the catalogued 1862 General sets.

19

From the Infringing Work, Page 227:

With sales of General outfits seemingly never meeting Lionel's expectations, the company chose turn to the "Gift Pack" to help exhaust the inventory of these products. Gift Packs lack track and transformers and were intended to supplement existing miniature railroad empires. Dubbed the "PRAIRIE-RIDER," this outfit came in an orange-and-white display-style outfit box.

**(g) 1963 Introduction:**

From Edition 2 of the Copyrighted Works, Page 157:

Some important changes took place in 1963 (late 1962) on the AAR Trucks. The early version, which originated in 1957, was still standard equipment, but most new production now used the second version of the Delrin knuckle (with pivot points) that eliminated the need for a knuckle pin. Earliest examples had an integral copper spring leaf that soon was replaced by a less expensive plastic leaf. To further reduce costs, 027 rolling stock and outfit components began to appear with one fixed and one operating coupler. The late version of the AAR Trucks, i.e., those with the axle ends visible when viewed from the bottom, surfaced late during the product year; hence some 1963 year-end production appeared with mixed trucks. This coupler and truck information assists in properly dating items.

From the Infringing Work, Page 233:

Hence, Lionel sought to improve the AAR-type truck they first introduced in 1957. Accordingly, a new plastic knuckle was introduced with integral plastic spring and pivot points. This eliminated not only the metal knuckle and pin but also the assembly step of rolling the rivet.

Some cars further reduced costs by removing the operating coupler completely, substituting a fixed coupler molded as one piece with the truck frame. Late in the year both the operating coupler and non-operating coupler trucks were further redesigned. When viewed

from the bottom, on the new design the ends of the axles were visible in the journal boxes.

**(h) Set #12800: 1965 B&M Freight Set:**

From Edition 2 of the Copyrighted Works, Pages 173 and 174:

The 2346 was the reissued Boston and Maine Geep previously catalogued as 2359; it headed an extremely colorful set with matching road name boxcar and caboose. This outfit came in a Type D display-style box with the new 1965 graphics. The contents, as with the 027 sets, were unboxed. The rolling stock came with late AAR trucks and had operating couplers at both ends. The moderately scarce deep blue variation of the –475 Boston and Maine boxcar has been a known component of this set. The engine was also available for separate sale in a Revised carton with "2346" stamped on the end flaps.

From the Infringing Work, Pages 253 and 254:

Unlike the other O-Gauge outfits, which came in white two-tier cartons, this set came in the same new type of display box used by 027 outfits. Of course, this meant the new 2346 Boston and Maine diesel, as well as the rest of the components, did not have individual boxes. Unlike so many of Lionel's sets, the caboose of this outfit actually matched the locomotive. Not only that, but so did one of the set's two boxcars! Sometimes this Boston and Maine boxcar surfaces with a deep blue color, which is somewhat difficult to locate.

Both boxcars, as did the rest of the rolling stock, came with late, open-journal AAR-type trucks. These trucks all had operating couplers.

**(i) Set #1426WS: 1948 Passenger Set:**

From Edition 2 of the Copyrighted Works, Page 36:

Similar to outfit 1434WS from 1947. The 2026 was a new medium-sized addition to the 027 steam roster; it was catalogued with a 6466WX whistle tender, which supposedly had a magnetic coupler. According to a Lionel Service Manual

21

listing, some 1948 production of the 2026 came with Baldwin disc drive wheels. The artist's rendering in the catalog erroneously shows the tinplate passenger cars as 2440 series; evidently, the catalog artwork was done prior to the renumbering of the cars. However, early issues of this outfit sometimes contained 2440 series cars in Art Deco boxes, since Lionel was in a transitional phase, changing from coil to magnetic couplers. The engine and tender, protected by liners, and the passenger cars usually came in newly released Early Classic boxes. The set carton was typical issue for the period.

From the Infringing Work, Page 41:

This outfit may frustrate collectors trying to match their sets to the catalog illustrations. As shown in the catalog illustration, the passenger cars were in the 2440-series - as in fact a handful of sets were. However, the bulk of the sets contained the listed 6440 and 6441 green sheet metal passenger cars.

A further anomaly may occur in this outfit, as the Lionel Service Manual states that some of the new 2026 locomotives produced in 1948 were equipped with Baldwin disc drive wheels. The locomotive and its matching coil coupler-equipped 6466WX whistle tender were packed in the new First Traditional boxes, as were the 6440 and 6441 passenger cars. Not surprisingly, the leftover 2440-series cars sometimes used were packaged in leftover Early Postwar boxes.

**(j) Set #1427WS: 1948 Freight Set:**

From Edition 2 of the Copyrighted Works, Page 36:

One of three sets catalogued in 1948 with the new 2026 locomotive. The engine and tender, protected by liners, and the other components came in new Early Classic boxes. The 6454 boxcar could have come in any of three road names since its inclusion in 1948 sets was done randomly. The outfit was listed with a 6466WX tender, which implies a magnetic coupler; however, a 2466WX is also apt to appear because the 6019 uncoupling/operating section could

22

uncouple either a coil or magnetic coupler. The outfit box was typical issue for 1948.

From the Infringing Work, Pages 41-42:

This freight outfit was also powered by the new 2026. The freight cars were essentially reissues of 1947 products, updated with the new mechanical couplers. The 6454 boxcar was produced in three road names – Baby Ruth, New York Central and Santa Fe – and any of these were apt to be used in this outfit. These cars were equipped with stamped steel steps integral with their frames.

The components of this outfit were packaged in First Traditional boxes, with the locomotive and tender boxes including liners. Occasionally a 2466WX was substituted for the prescribed 6466WX tender.

(iii) the Infringing Work substantially copied approximately ninety percent of the 3,000 plus factoids that Plaintiff selected and included in Edition 2, some of which had earlier been included in Edition 1 or the Pocket Guide, with factoids being the compilation author's choices about which facts to include, in what order to place them, and how to arrange them (many of these factoids were Plaintiff's unique opinions formed specifically for Editions 1 and 2, as well as the Pocket Guide, and were opinions that were not necessarily shared by all Advance Collectors). The selection choices made by Plaintiff in Edition 2 as to what factoids to include, and which ones not to include, made his Copyrighted Works "Collecting by Paul", In brief example:

(a) the Infringing Work copied exactly the decisions made by Plaintiff as to which Sets to include in Edition 2, some of which had earlier been included in Edition 1 or the Pocket Guide, even when Plaintiff creatively chose to include sets that were not included in any Lionel Consumer Catalog;

(b) the 2007 Infringing Work copied exactly the decisions made by Plaintiff as to which Sets that the Lionel Consumer Catalogs showed were actually produced or not produced by Lionel that were included in Edition 2, some of which had earlier been included or not included in Edition 1 or the Pocket Guide, even where

23

current opinions by Advance Collectors based on newly discovered evidence over the past few years differed from the opinions that Plaintiff reached in the 1998 Edition 2;

(c) the Infringing Work copied exactly the decisions made by Plaintiff as to the order of Sets shown in Edition 2, even where the creative decisions made by Plaintiff differed from the order the Sets were shown (if shown at all) in the Lionel Consumer Catalogs;

(d) the Infringing Work copied virtually exactly the decisions made by Plaintiff as to the contents of Sets where Plaintiff's opinions and selection decisions were that the contents of certain Sets differed, or had the potential to be different, than as listed in the various Lionel Consumer Catalogs;

(e) the Infringing Work copied virtually exactly the decisions made by Plaintiff as to the potential variations of engines and/or cars in Sets where Plaintiff's opinions and selection decisions as to such potential variations were different than the listed contents of such Sets in the various Lionel Consumer Catalogs;

(f) the Infringing Work copied virtually exactly the decisions made by Plaintiff as to possible and various outside factors that led Lionel to make their various marketing and production decisions as to the make-up of certain Catalogued Sets;

(g) the Infringing Work copied virtually exactly the decisions made by Plaintiff as to possible and various outside factors that led Lionel to make their various marketing and production decisions as to various variations of the contents of certain Catalogued Sets;

(h) the Infringing Work copied virtually exactly the decisions made by Plaintiff as to the method of packaging the contents of certain Catalogued Sets, including the manner of boxing, or not boxing, the individual pieces, the types of possible boxes used to package the individual pieces, the possibilities of liners being used to box certain individual pieces, the types of possible Set, or Outfit, boxes

24

used to package the entire set and possible variations, and potential differences in value among possible variations of different possible types of Set, or Outfit Boxes, used to package the entire Set;

(i) the Infringing Work copied virtually exactly the decisions made by Plaintiff in Edition 1 and Edition 2 to decide whether, where certain Sets had possible different variations of contents or type of packaging of the Set, to offer various different opinions as to the different possible values of such Set subject to the specifically-listed variations;

(j) the Infringing Work copied virtually exactly the decisions made by Plaintiff in Edition 1 and Edition 2 to decide whether, where certain Sets had a high-likelihood of being found with reproduction or fake elements, to draw attention to the possibilities of finding the Sets with reproduction or fake elements in such Sets;

(k) the Infringing Work copied virtually exactly the selection decisions made by Plaintiff, and the various decisions he made as to the language used, in Plaintiff's descriptions of the contents of each set where the manner Plaintiff choose to describe the contents of the Set differed than the manner that Lionel described said contents;

(l) the Infringing Work copied virtually exactly the selection decisions made by Plaintiff about what factoids that were contained in the thousands of pages of the Lionel Service Manual should be included in a book about Catalogued Sets;

(m) the Infringing Work copied virtually exactly the selection decisions made by Plaintiff about what factoids that were contained in the thousands of pages of the Lionel Consumer Catalogs should be included in a book about Catalogued Sets;

(n) the Infringing Work copied virtually exactly the selection decisions made by Plaintiff about what a serious, or advance, collector of Lionel Toy Trains should prefer or attempt to collect;

25

(o) the Infringing Work copied substantially exactly the selection decisions made by Plaintiff in Edition 1 and Edition 2 about what to highlight and write in further-detail as to each Set where there existed tens of different factoids to highlight in a Paragraph or two on each Catalogued Set;

(p) the Infringing Work copied substantially exactly the selection decisions made by Plaintiff in Edition 1 and Edition 2 about what items or Sets were common, what items or Sets were rare and what items or Sets were valuable in relation with other Sets;

(q) the Infringing Work copied substantially exactly the selection decisions made by Plaintiff in Edition 1 and Edition 2 about what years possible variations of Lionel Trains and/or the boxes they were packaged in were made and/or available;

(r) the Infringing Work copied substantially exactly the selection decisions made by Plaintiff in Edition 1 and Edition 2 about what years possible variations of Lionel Trains and/or the boxes they were packaged in were made and/or available;

(s) the Infringing Work copied substantially exactly the selection decisions made by Plaintiff in Edition 1 and Edition 2 about the pattern to use to describe the contents of each Catalogued Sets; and

(t) the Infringing Work copied substantially exactly the selection decisions made by Plaintiff in Edition 1 and Edition 2 as to the terminology used by Plaintiff to describe various contents included in certain Catalogued Sets.

(iv) the Infringing Work substantially copied all but two of the known various editing mistakes and typos that Plaintiff and his editor unintentionally included in Edition 2, some of which had earlier been included in Edition 1 or the Pocket Guide. In brief example:

(a) Edition Two, when discussing the 1947 Freight Set #1431 on page 31, noted that it was a continuation of the 1946 Set #1401. However Plaintiff inadvertently transposed the numbers

26

of #1401 and wrote it as #1041 in the text of Edition 2. The Infringing Work copied exactly this editing mistake on page 28 of that work and referred to the earlier Set as "#1041";

(b) Edition Two, when discussing the contents of the 1955 Set #2243W on Pages 80 and 81, mistakenly included the #6417 Pennsylvania N5C Caboose instead of the proper #6417-25 Lionel Lines N5C Caboose. This error occurred as a result of a prior cut and paste of the preceding set, which included a #6417 Pennsylvania Caboose and this mistake was never noticed by either Plaintiff nor his editors even through the accompanied picture of the Set clearly showed the #6417-25 Lionel Lines Caboose. The Infringing Work copied exactly this editing mistake on Page 124 of that work even through, believe it or not, the accompanied picture of that Set in the Infringing Work clearly showed the presence of the #6417-25 Lionel Lines Caboose; and

(c ) Edition Two, when listing the contents of the 1962 Set #11212 on Page 154, mistakenly listed the #3413 Mercury capsule launcher as the "3413 Mercury capsule carrier." This mistake was never noticed by Plaintiff or his editors. The Infringing Work copied exactly this editing mistake on Page 228, listing this car as the "3413 Mercury capsule launcher" even through two pages later in Set #13058 the car is properly listed as the "#3413 Mercury capsule launcher."

(v) the Infringing Work substantially copied each of the thirty "ringers" that Plaintiff and his editor intentionally included in Edition 2, some of which had earlier been included in Edition 1 or the Pocket Guide. In brief example:

(a) Edition Two described on Page 32 that the 1947 Lionel Set with the Catalogued Number of #2124W included the Engine having a "large-shield" Original Box. In fact, "large-shield" Engine Boxes were not produced by Lionel until late 1949 and no such "large-shield" Original Boxes were ever included by Lionel in the 1947 Set #2124W. The Infringing Work included this ringer by Ambrose on Page 33 of that work;

27

(b) Edition Two described on Page 58 that the 1952 Lionel Set with the Catalogued Number of #1467W that the Erie Alco came in an OPS Master Carton. In fact, this type of Master Carton was never manufactured by Lionel for this particular Engine. The Infringing Work included this ringer by Ambrose on Page 82 of that work;

(c ) Edition Two described on Page 66 that the 1953 Lionel Set with the Catalogued Number of #2213WS that the Set Box was the "new circle-L Set Box." In fact, this type of Set Box was never manufactured by Lionel for this particular Set. The Infringing Work included this ringer by Ambrose on Page 98 of that work;

(d) Edition Two described on Page 89 that the 1956 Lionel Set with the Catalogued Number of #1553W included a "69 Watt" Transformer. In fact, a Transformer with this exact Wattage was never manufactured or catalogued by Lionel. The Infringing Work included this ringer by Ambrose on Page 134 of that work;

(e) Edition Two described on Page 98 that the 1957 Lionel Set with the Catalogued Number of #1571 that the Set Box was the "single-tier basket-weave carton." In fact, this type of Set Box was never manufactured by Lionel for this particular Set. The Infringing Work included this ringer by Ambrose on Page 146 of that work;

(f) Edition Two described on Page 143 that the 1961 Lionel Set with the Catalogued Number of #1648 included a #1063 75-Watt Transformer. Edition Two further went on in the Comments section of that Set to discuss that some #1063 Transformers in 1961 were produced with a Green Whistle Control Button to prevent the reversing unit of the engine from inadvertently engaging when the whistle was blown. In fact, only the #1063-100 Transformer came with a Green Whistle Controller Button, the #1063-100 Transformer was only included by Lionel in 1961 Uncatalogued Sets that included a "Scout" Steam Engine, and the #1648 Set was never produced by Lionel with a Transformer that had a Green Whistle Control Button or a type #1063-100 Transformer. The Infringing Work included this ringer by Ambrose on Page 214 of that work;

(g) Edition Two described on Page 165 that the 1964 Lionel Set with the Catalogued Number of #11420 that the Set Box was the "display style box." In fact, this type of Set Box was never manufactured by Lionel for this particular Set. The Infringing Work included this ringer by Ambrose on Page 243 of that work; and

(h)    Edition Two described on Page 207, in its index of sets, that there was a 1960 Lionel Set with the Catalogued Number of #2553W. In fact, this set was catalogued and manufactured as "2553WS". The Infringing Work included this ringer by Ambrose on Page 271 of that work.

(vi) the Infringing Work substantially copied the format that Plaintiff creatively introduced in Edition 1 and Edition 2 for the presentation of Toy Train Catalogued Sets; and

(vii) the Infringing Work substantially copied the various terminologies created by Plaintiff in Editions 1 and 2 and the Pocket Guide for his expressions of the various types of Original Boxes (Sets and/or Individual) and Manufacturing Variations produced by Lionel during the Post-War Period. In brief example:

(a) Plaintiff in Edition One of the Copyrighted Works, and later in Edition 2, created and used a terminology to identify various types of boxes Lionel used to package individual items in Catalogued Sets during the Post-War period. Plaintiff's box terminology was as follows:

| | |
|---|---|
| Art Deco | 1945/46 |
| Art Deco with Toy Manufacturers Association logo | 1947/48 |
| Early Classic Box | 1947/49 |
| Middle Classic Box | 1949/1955 |
| Late Classic Box | 1956/57 |
| Bold Classic Box | 1958 |
| Perforated Box | 1959/60 |
| Perforated Picture | 1961/62 |
| Orange Picture | 1961/64 |

29

Hillside Orange Picture 1964/65

Cellophane             1966

Checkerboard           1968/69

Doyle and Krause copied virtually identically Plaintiff's box terminology, both as to titles and substance, as the following are the box terminology they used in the Infringing Work:

Early Postwar box      1945/46

Early Postwar box with Toy Manufacturers Association logo     1947/48

First Traditional Box  1947/49

Middle Traditional Box  1949/1955

Late Traditional Box   1956/57

Bold Traditional Box   1958

Perforated Box         1959/60

Perforated Picture     1961/62

Orange Picture         1961/64
Hillside Picture       1964/65

Window                 1966

Checkerboard           1968/69

(b) Doyle in the Infringing Work copied Plaintiff's use of terminology in the Copyrighted Works even when said terminology was different than the terminology that Doyle had used in other books (not including the Infringing Work) about Lionel Trains that Krause published and in which averred that Doyle was the author.

24. The Acknowledgement Page written by Doyle in the Infringing Work did not thank Ambrose for the Copyrighted Works that Doyle had virtually copied nor did it acknowledge Ambrose in any manner. The Acknowledgement Page instead, in substantial part, thanked each of the three Auction Houses that competes against

30

ABT in Internet Auctions for Lionel Post-War Trains and did not mention ABT in any manner, even through ABT in the past three years sold more High-Quality Lionel Post-War Sets than the three identified Auction Houses. Many of the Catalogued Sets that were pictured in the Infringing Work that came from Stout Auctions were actually "put-together" Sets where the Sets were assembled based on the copyrighted works of Ambrose. Some of the Sets that were pictured in the Infringing Work were not correct and contradicted the text that the Infringing Work copied from the Copyrighted Works. Other pictured Sets in the Infringing Work either contradicted the text that Defendants copied from the Copyrighted Works or the variations and differences visible in the Pictures were not mentioned in the text for that particular Set in the Infringing Work.

25. Ambrose and ABT have been contacted by multiple Collectors since the publication of the Infringing Work questioning whether Ambrose had sold his Books to Doyle or whether Doyle had been hired by Ambrose to write the next version of Ambrose's Post-War Catalogued Set Book. One Collector questioned whether Ambrose was still involved in ABT, noting that the Infringing Book had no mention of ABT but instead had a glowing note about ABT's competitors, and another questioned whether Ambrose would change the ABT name, taking the "B" out of it and replacing it with a "D" for Doyle.

26. The confusion between the Infringing Work and the Copyrighted Works, as well as Ambrose's involvement with ABT, is further fueled by the fact that the Infringing Work is being advertised, and made available, on multiple Internet platforms and sources, including Amazon and Ebay. Ebay is one of the most important venues for advertising the ABT Auctions, as well as for sales of the Copyrighted Works.

Case 2:05-mc-02025-A Document 3473 Filed 09/17/2007 Page 32 of 46

27. Upon information and belief, Doyle is a fraud as an "author" and has over the past several years written a series of books on Lionel Trains where he merely substantially copied the substance of the copyrighted works of others and claimed such text as his own. "No plagiarist can excuse the wrong by showing how much of the work he did not pirate." Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49, 51 (2d Cir. 1936)(Judge Learned Hand).

28. Neither Krause nor Doyle had the permission or the consent of Plaintiff, or his publishers, to substantially copy any portion of the Copyrighted Works or to distribute, in whole or in part, his Copyrighted Works

29. The Infringing Work infringed the copyrights in the Copyrighted Works, and Plaintiff and/or his publishers' exclusive rights to distribute, in whole or in part, his Copyrighted Works. Doyle and Krause had access to the Copyrighted Works, Doyle and Krause actually copied and transcribed portions of the Copyrighted Works into the Infringing Work, and Doyle and Krause engaged in "actionable copying" of portions of the Copyrighted Works by copying protected portions of the Copyrighted Works that were copyrightable and where the copying of such was in violation of the Copyright Act, 17 U.S.C. §§ 101, et seq. The Infringing Work took the essence of the copyrightable portions of Edition 1 and Edition 2 of the Copyrighted Works.

30. Any knowledgeable and unbiased Train Collector who examined the Infringing Work and Edition 2 for at least one hour would have concluded that Doyle had substantially copied and transcribed Edition 2 to use as the basis of the Infringing Work.

31. The Infringing Work interfered with, and caused material damages, to Plaintiff's intent to publish his own Edition 3 of

his Catalogued Sets Book, his investment in ABT and the goodwill of his name.

32. The substantial material copied directly from the Copyrighted Works into the Infringing Work was significantly more in scope than allowed by any fair-use exception included in the Copyright Act, 17 U.S.C. §§ 101, et seq., and as such, Krause and Doyle did not engage in the fair use of any portion of the Copyrighted Works that they copied, transcribed and incorporated into the Infringing Work.

**The Infringing Activities (The Defendants):**

33. At all times relevant hereto, Doyle was a member of Defendant TCA and was subject to all rules and regulations governing the conduct of members of Defendant TCA, including the ability of the TCA to terminate Doyle's membership on grounds of "conduct unbecoming a member."

34. At all times relevant hereto, as part of its averred determined promotional efforts to establish Doyle as an actual author of Toy Trains Books:

> (i) Defendant TCA treated Doyle in a manner that it had not treated any other member and conveyed onto Doyle benefits that it had not made available to any other member;
>
> (ii) Defendant TCA, for reasons unknown to the Plaintiff and other intelligent observers, placed Doyle on its "Standard Committee" despite its past acknowledgment of Doyle's lack of any advance knowledge on Toy Trains;
>
> (iii) Defendant TCA continually promoted Doyle as an authority on Toy Trains, despite its past acknowledgment that Doyle lacked any advance knowledge on Toy Trains;
>
> (iv) Defendant TCA allowed Doyle unfettered, unprecedented and exclusive access to the valuable toy trains exhibited in its Toy Train Museum and

33

allowed Doyle to take pictures of said Toy Trains and use such pictures in his for-profit books;

(v) Defendant TCA allowed Doyle to publicize, and include such mention in his books, that he had unfettered, unprecedented and exclusive access to the valuable toy trains exhibited in the TCA's Toy Train Museum;

(vi) Defendant TCA allowed Doyle to hold book signings at the TCA Museum of the various books he has averred he authored while denying the opportunity for actual authors to have similar book signings;

(vii) Defendant TCA publicized the book signings that Doyle was allowed to hold at the TCA Museum while denying the opportunity for actual authors to have similar book signings;

(vii) Defendant TCA publicized the book signings that Doyle was allowed to hold at the TCA Museum in tens of thousands of mailings made at member's expense, including, upon information and belief, the Infringing Work;

(viii) Defendant TCA purchased, stocked and resold books "authored" by Doyle, including the Infringing Work, at its Bookstore located at the TCA Museum while at the same time refusing to stock similar books on Toy Trains written by members of the TCA that actually authored their books;

(ix) Upon information and belief, Defendant TCA purchased, stocked and resold the Infringing Work at its Bookstore located at the TCA Museum after Defendant TCA was in receipt of the June 22, 2007 cease and desist letter from Plaintiff's counsel as to the Infringing Work;

(x) Defendant TCA allowed the promotion and sale of copies of the Infringing Work at the TCA Annual Convention held in Denver, Colorado in the last week of June 2007 even after Defendant TCA was in receipt of the June 22, 2007 cease and desist letter from Plaintiff's counsel as to the Infringing Work;

(xi) Defendant TCA failed to direct its various Divisions and Chapters not to allow further sales of the Infringing Work even after Defendant TCA

34

Case 2:05-mc-02025-A    Document 3473    Filed 09/17/2007    Page 35 of 46

was in receipt of the June 22, 2007 cease and desist letter from Plaintiff's counsel as to the Infringing Work and had been presented evidence of the actual copying that Doyle had done as to Ambrose's Copyrighted Works;

(xii) Defendant TCA allowed and promoted further book signings by Doyle at the TCA's Toy Train Museum, including one scheduled for October 2007, even after Defendant TCA was in receipt of the June 22, 2007 cease and desist letter from Plaintiff's counsel as to the Infringing Work and had been presented evidence of the actual copying that Doyle had done as to Ambrose's Copyrighted Works; and

(xiii) Defendant TCA published various reviews of the books averred to be authored by Doyle at its website, *e-train*, including reviews of Books averred to have been authored by Doyle even after the TCA had been placed on written notice that Doyle had actually substantially copied such books and infringed Plaintiff's copyrights.

35. At all times relevant hereto, as part of its averred determined promotional efforts to establish Doyle as an actual author of Toy Trains Books:

(i) Defendant Eastern Division treated Doyle in a favorable manner that it had not treated any other participant or member at its York Train Meets;

(ii) Defendant Eastern Division allowed Krause and Doyle to state that Doyle was a "featured guest" at its York Train Meets on the back cover of the Infringing Work;

(iii) In the alternative, to the extent that Defendant Eastern Division had not designated Doyle as a "featured guest," Defendant Eastern Division did not contact either Doyle or Krause and request them to remove the untrue statement from the back cover of the Infringing Work once it was informed of such a claim;

(iv) Upon information and belief, Defendant Eastern Division promoted the Infringing Work in mailings it made to tens of thousands of TCA members in the Spring of 2007;

35

(v) Defendant Eastern Division allowed Doyle and Krause to hold book signings of the Infringing Work, and to highly publicize the publication of the Infringing Work, at multiple tables in the Orange Hall at the York Train Shows in April 2007;

(vi) Defendant Eastern Division allowed the members who purchased tables at the York Train Shows in April 2007 to sell copies of the Infringing Work;

(vii) Defendant Eastern Division, even after it was served with undisputable evidence that Doyle had actually copied Ambrose's Copyrighted Works and a cease and desist letter from Plaintiff's counsel as to the Infringing Work, nevertheless sent out tens of thousands of mailings to TCA members in August 2007 that promoted Doyle as an actual author of Toy Train Books;

(viii) Defendant Eastern Division, even after it was served with undisputable evidence that Doyle had actually copied Ambrose's copyrighted works and a cease and desist letter from Plaintiff's counsel as to the Infringing Work, failed to direct its table holders at the York Train Shows in October 2007 that they could not sell copies of the Infringing Work;

(ix) Defendant Eastern Division, even after it was served with undisputable evidence that Doyle had actually copied Ambrose's copyrighted works and a cease and desist letter from Plaintiff's counsel as to the Infringing Work, allowed members who purchased tables at the York Train Shows in October 2007 to publicize Doyle's books, including the Infringing Work; and

(x) Defendant Eastern Division, even after it was served with undisputable evidence that Doyle had actually copied Ambrose's copyrighted works and a cease and desist letter from Plaintiff's counsel as to the Infringing Work, allowed the members who purchased tables at the York Train Shows to hold book signings by Doyle, including those that publicize, in whole or in part, the Infringing Work.

36. Upon information and belief, the value of the promotion given to Doyle by Defendants TCA and Eastern Division was substantially greater than $20,000.00.

37. Defendants TCA and Eastern Division, by the published rules of the various Train Shows that they, and the various Divisions of the TCA hold, including, but not limited to, the Annual Convention and the York Train Shows, have full authority to control the items that members exhibit and/or offer for sale at tables that they purchase at such Train Shows.

38. Upon information and belief, the Lionel Corporation recently made a threat to file a lawsuit against Defendant TCA based on the past sales at TCA meets of items marked "Lionel" that were not actually manufactured, or licensed to be manufactured, by Lionel. The TCA recently responded by instituting a Compliance policy on table holders of any train meet sponsored by either it or any of its Divisions. As posted on its website, Defendant TCA now requires, in part:

> To All Manufacturers and Vendors Who Sell Reproduction Trains and Parts at TCA Meets or Advertise Trains and Parts in TCA Publications:
>
> The Association requires that all reproduction parts that are major components and large enough to mark without damaging the piece be marked as a reproduction with either the manufacturer's logo or "R" visible on a cursory examination. A "major" part is one that if missing would seriously detract from the item's value. This includes complete locomotives, cars, accessories, etc.
>
> To sell these reproduction trains and train parts at TCA meets or by ad in TCA publications, a Standards Committee Inspection Report must be completed by a Standards Committee member. If you have reproduction trains or train parts that have not been inspected, contact the Standards Committee to have an Inspection Report completed. A copy of the Report will then be filed with the Business Office and they will issue a Certificate

37

of Compliance. The Certificate of Compliance must be displayed on your table at TCA meets. Ads in TCA publications must note your compliance with the Marking Standards in order to be published. (Revised procedure adopted July 1997)

39. The Registration Packet sent out by Defendant Eastern Division as to the October 2007 York Shows stated, in part:

In Registration for Table/Booth Space at this meet, you are agreeing to abide by the Meet Rules, including staying until the conclusion of the meet at 2:00 p.m. Saturday. Sanctions and/or fines will be imposed on members who do not comply.

The Registration Packet further stated that:

Certification of Compliance. TCA, through its National Standards Committee, has modified the procedure for the sale of properly marked reproduction parts, papers and boxes. All vendors or reproduction parts, papers and boxes must have a Certificate of Compliance, and display it on their table at all TCA functions. If you do not have a Certificate, they are available from the National Business Office at tca-office@traincollectors.org. Applications for a Certificate and a Temporary Certificate are also available from your Division President, Secretary, and Standards Committee members. Standard Committee members will check all tables/booths for a Certificate of Compliance and properly marked parts, papers and boxes. No change has been made in the parts marking requirements which have been continually published in the TCA newsletter for many years. [Members/dealers reserving table/booth space at this Meet will receive an application for the Certificate with the return of their badge(s).]

40. The Registration Packet included a Registration Form that each member had to completely fill out in order to have a table at the York Show. The Registration Form required the number of the TCA Certification of Compliance that had been issued to that member to be included on the Registration Form in order to be eligible to receive a table at the York Show. Upon information and belief, other Divisions of the TCA have also recently required, as directed by Defendant TCA, that table holders have

38

Case 2:05-mc-02025-A Document 3473 Filed 09/17/2007 Page 39 of 46

the TCA Certification of Compliance as a requirement before being allowed to have tables at local meets.

41. Defendants TCA and the Eastern Division have in the past sanctioned members who have violated the published Meet Rules applicable at Toy Train Meets held by the TCA, Eastern Division and/or various other divisions of the TCA, including members who attempted to sell items on their tables that were not allowed to be sold or exhibited by rules promogulated by these Defendants.

42. Neither Defendants TCA nor the Eastern Division had the permission or the consent of Plaintiff, or his publishers, to substantially copy any portion of the Copyrighted Works, to distribute any derivative of his Copyrighted Works, to allow and profit from the distribution of the Copyrighted Works, or any derivatives thereof, or to infringe in any manner with any portion of the copyrights as to the Copyrighted Works. The actions of Defendants TCA and/or the Eastern Division have violated provisions of the Copyright Act, 17 U.S.C. §§ 101, et seq. and have infringed the copyrights as to the Copyrighted Works.

43. The rear cover of the Infringing Work stated that it was "THE Authority for Lionel Train Sets." (emphasis in the original).

### COUNT I

### (Contributory Copyright Infringement)

Paul V. Ambrose v. Train Collectors Association and Eastern Division - T.C.A.

44. Paragraphs 1 through 43 of this Complaint are incorporated herein by reference as if fully set forth herein.

39

45. The Infringing Work infringed the valid copyrights Plaintiff and/or his publishers held as to the Copyrighted Works.

46. The sale and/or promotion of the Infringing Work infringed upon Plaintiff's and/or his publishers' exclusive rights to distribute all or part of the Copyrighted Works, including any derivatives based thereon.

47. Plaintiff controls all rights, by assignment, contract or by operation of law, to the Copyrighted Works, the copyrights therein, any prior or current Infringements thereof, and any claim or cause of action arising from such Infringements.

48. Defendants TCA and the Eastern Division each had knowledge of the Infringing Activity and each was sent at least one cease-and-desist letter by Plaintiff's counsel.

49. Defendants TCA and Eastern Division materially contributed to the Infringing Conduct by:

> (i) allowing the use of their names on the Infringing Work and in the promotions for the Infringing Work;
>
> (ii) promoting the Infringing Work in a series of publications mailed to tens of thousands of members;
>
> (iii) organizing book signings for Doyle and/or the Infringing Work which led many members to believe that Defendant TCA was authorizing and publishing the Infringing Work and other books "authored" by Doyle;
>
> (iv) undertaking a series of actions that lead substantial numbers of members to form the opinion that the Infringing Book had been published by, or at least authorized by, Defendants TCA and/or the Eastern Division;
>
> (v) providing resources and facilities for known infringing activities;

40

Case 2:05-mc-02025-AJS Document 3473 Filed 09/17/2007 Page 41 of 46

> (vi) receiving, or at least the receipt by certain officials of the Defendants, of valuable perks and/or other consideration as a result of the publication of the Infringing Work and/or other books averred to be authored by Doyle;
>
> (vii) inducing in part the infringing activities of Doyle and Krause to damage Plaintiff and/or ABT;
>
> (viii) proving the site and facilities for known infringing activity (i.e. Toy Train Meets and a Bookstore) to sell a substantial number of copies of the Infringing Work;
>
> (ix) granting Doyle benefits not available to any other member in order to allow Doyle to falsely establish himself as an author of books on Toy Trains; and
>
> (x) allowing a series of communications to be sent out by the TCA and past officials that stated that it was appropriate for Doyle to have copied Plaintiff's works.

50. Defendants' acts constitute infringement of the copyrights in the Copyrighted Works (Edition 2, Edition 1 and the Pocket Guide) in violation of the Copyright Act, 17 U.S.C. §§ 101, et seq.

51. Defendants' copyright infringements have caused, and will continue to cause, Plaintiff and/or his publishers to suffer substantial injuries, loss, and damage to his/their proprietary and exclusive rights to the copyrights in the Copyrighted Works as well as Plaintiff's investment in ABT. Defendants' copyright infringements have also caused, and will continue to cause, interference with Plaintiff and ABT's business reputations and goodwill, diverted Plaintiff and ABT's trade, and caused a loss of profits, all in an amount yet ascertained. Defendants' Infringing Work is also directly aimed at ABT and its Slogan that "We Wrote the Book on Toy Trains" and will lead, and has led, to confusion about the validity and truthfulness of ABT's Slogan. Ambrose also intended to develop an Edition 3 of his works to

41

promote ABT and has the contractual, and exclusive, right to do so without reference to any other publisher.

52. Defendants' copyright infringement, and the threat of continuing infringement, has caused, and will continue to cause, Plaintiff and his publishers repeated and irreparable injury. It would be difficult to ascertain the amount of money damages that would afford Plaintiff and his publishers adequate relief at law for Defendants' acts and continuing acts, and a multiplicity of judicial proceedings would be required. Plaintiff and/or his publishers' remedy at law is not adequate to compensate them for the injuries already inflicted and further threatened by Defendants. Therefore, Defendants should be restrained and enjoined pursuant to the Copyright Act, 17 U.S.C. §§ 101, et seq.

53. The unauthorized copying of the Copyrighted Works by Defendants into their Infringing Work infringes Plaintiff and/or his publishers' exclusive rights under Section 106 of the Copyright Act to reproduce the Copyrighted Works and/or to undertake derivative works based on the Copyrighted Works.

54. Defendants have the right and ability to supervise, and have a direct financial interest in, the aforesaid infringing activities.

55. Defendants have knowingly induced, caused, participated in, materially contributed to and derived economic benefit from the infringements of the copyrights as to the Copyrighted Works, and Plaintiff has been damaged and continues to be damaged thereby.

56. Defendants' aforesaid conduct have been and continues to be intentional, deliberate, willful, and with full knowledge of the aforementioned copyrights and the infringements thereof.

42

57. Defendants' conduct, as set forth herein, is causing and, unless enjoined and restrained by this Honorable Court, will continue to cause Plaintiff and/or his publishers irreparable harm.

58. The natural and probable and foreseeable result of Defendants' wrongful conduct has been to deprive Plaintiff and/or his publishers of the benefit of selling Plaintiff's Copyrighted Works, and the future derivate works based therein, to injure Plaintiff's relations with present and prospective customers (both Bidders and Consigners) as to ABT, and to damage Plaintiff's goodwill in his name as a published author and an acknowledged expert in Lionel Post-War Toy Trains.

## COUNT II

### (Vicarious Copyright Infringement)

<u>Paul V. Ambrose v. Train Collectors Association and Eastern Division – T.C.A.</u>

59. Paragraphs 1 through 58 of this Complaint are incorporated herein by reference as if fully set forth herein.

60. Defendants TCA and Eastern Division have the right to control, and have in the past regularly exercised said right, the selection of items offered for sale and/or exhibit at Toy Train Shows that they organize, including for Defendant TCA the Annual Convention, which was held in June, 2007 in Denver, Colorado, and for Defendant Eastern Division, the York Train Shows held in April 2007 and October 2007.

61. Defendants TCA and Eastern Division were aware that table holders at the April 2007 York Meets and the 2007 Annual Convention in Denver sold and/or exhibited copies of the Infringing Work.

43

62. Defendants TCA and Eastern Division are aware that table holders at the October 2007 York Meets intend to sell and/or exhibited copies of the Infringing Work and has refused to bar or limit the sale and/or exhibition of copies of the Infringing Work.

63. Defendant TCA is aware that table holders at various meets held by its Divisions have sold and/or exhibited, or as to meets held after the filing of this Complaint, intend to sell and/or exhibit, copies of the Infringing Work and has refused to bar or limit the sale and/or exhibition of copies of the Infringing Work at such meets.

64. Defendants TCA and Eastern Division receive a direct financial benefit from the Toy Train Shows they organize, including, in part, the payment of table rental fees from members who rent tables to sell the Infringing Work and admission paid by members and/or non-members to attend the Toy Train Shows in order to purchase the Infringing Work.

65. Upon information and belief, Defendant TCA has continued to sell copies of the Infringing Work at the Bookstore located at the TCA's Toy Train Museum even after receipt of Plaintiff's counsel cease and desist letter as to the Infringing Work.

WHEREFORE, Plaintiff Paul V. Ambrose respectfully request judgment against Defendants Train Collectors Association and Eastern Division – T.C.A., jointly and severally, as follows:

> (A) That the Court issue a Preliminary Injunction enjoining and restraining Defendants and their respective agents, servants, employees, successors and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Defendants, from directly or indirectly infringing, or causing, enabling, facilitating, encouraging, promoting, selling, exhibiting and inducing or participating in the infringement of, any of Plaintiff and/or his

44

publishers' respective copyrights or exclusive rights protected by the Copyright Act, whether now in existence or hereafter created, in the Copyrighted Works;

(B)   That the Court issues a Preliminary Injunction enjoining and restraining Defendants, including its members and/or table holders, from any distribution, sale or publication of the Infringing Work, and to immediately provide all of Defendants' members and/or table holders with a copy of the Preliminary Injunction Order;

(C)   That the Court issues a Preliminary Injunction enjoining and restraining Defendants from any advertisement, publicity, author signings, direct mailing, or listing on any web site any matter pertaining to the Infringing Work, other than mentioning the present civil action filed against them and/or the Order;

(D)   That the Court issues a Permanent Injunction making permanent the orders requested in Paragraphs (A), (B) and (C) above;

(E)   That Plaintiff be awarded statutory damages for Defendants' deliberate, determined and willful copyright infringements in the amount of $450,000.00 pursuant to 17 U.S.C. § 504(c), together with prejudgment and post-judgment interest;

(F)   That the Court issue an order requiring Defendants to file with this Court and serve on Plaintiff within thirty (30) days after service of an injunction a report, in writing, under oath, setting forth in detail the manner and form in which Defendants have complied with the Temporary and/or Permanent Injunction;

(G)   That the Court award Plaintiff his reasonable attorney's fees pursuant to 17 U.S.C. § 505;

(H)   That the Court award Plaintiff his costs of suit incurred herein; and

45

(I) That the Court grants Plaintiff such other and further relief as it deems just and equitable.

Respectfully submitted,


By:    **/s/ Drew J. Bauer**
       Drew J. Bauer, Esquire
       Attorney for Plaintiff
       PA I.D. No. 37536
       Post Office Box 14537
       Pittsburgh, PA 15234
       (412) 833-1700
       (412) 833-1170 (fax)
       drewjbauer@yahoo.com

46